Council, thank you very much for agreeing to this format and we're ready to proceed. Mr. Romano. Morning. Morning. Oh, I'm sorry. You're on the left-hand side of my screen, so I'm assuming you're the appellant, but okay. Ms. Romano, go ahead. Good morning. It's not a good day for me. It's almost the afternoon. Good morning. Allison Brill, Assistant Federal Public Defender for Francisco Brito, and I'd like to reserve three minutes for rebuttal. Okay. Okay. This appeal raises important questions of what more, if anything, is required of Defense Council at criminal sentencing proceedings. Mr. Brito appealed a 70-month sentence for illegal re-entry after deportation based on three grounds, two procedural and one substantive. I'd like to focus my argument on the two procedural points in response to the government's claim that one, the objection to the district court's factual error was waived, and two, the objection to the district court's lack of meaningful consideration was not preserved. Neither position is correct and both are contrary to this court's precedents. I'll start with waiver unless this court has questions to begin with. Waiver is a significant and serious penalty to a criminal defendant. That is why there's such strong language in this court's waiver cases about what counsel must do to deny his client appellate review. In James, this court explained an attorney must have knowledge of a legal error and then intentionally choose to abandon that right. Waiver has been found in cases where there is an explicit agreement for stipulation or when counsel consciously refrains from objecting as a tactical matter. Well, here's this kind of a conditional waiver, apparently. Mr. Romano was arguing waiver, but it's based on when counsel was asked if the factual background of this was as the court had just recited and defense counsel very candidly admitted, I was sorry, I was kind of following a timeline here. If what you just said is consistent with the PSR, then we don't object. The PSR did have the correct timeline in it and the correct number of prior illegal reentries as two as opposed to three. So from your position, counsel was saying, look, if you're saying that my client had previously reentered twice as I set forth the presentence report, I don't object to that. But if you've varied from that, which the court did, then I'm not saying I will not object to that. So I think we understand your waiver argument. So why don't you proceed. You had a Sure, I wanted to speak about the government's basically request to this court to broaden the rule in Flores Mejia. Okay, I'm sorry, would it be okay before you leave waiver just to ask how then should we understand when a lawyer says no objection? In James, we treated that as a waiver and the government seems to read that as a rule that saying no objection generally amounts to a waiver. How do you suggest that we should read? No. Sure. So I think, you know, James was actually an amended opinion, which added language corroborating what that no objection actually meant no objection, that wasn't even enough. And there was three, you know, factual points that this court found to really find that the no objection meant no objection for purposes of waiver on appeal. So, so in this case, I wouldn't even say that counsel said no objection. And certainly there's nothing else because it's such a small record to begin with. And if we look at other cases, government of Virgin Islands versus Rosa, for example, which you know, James relied on, the council there failed to object and agreed three times to a jury instruction and still that was not found to be waiver and Rosa relied on the Ninth Circuit case Perez in which the defense counsel had proposed those jury instructions. And again, it was not waiver on appeal to raise that. So, so courts really look for a lot more than what is in this record. All right. I'm sorry to sidetrack you from Judge McKee. That's fine. That's fine. Okay. Any further questions on waiver? Yeah, wait a second. So, so your point is that he has to go back for resentencing. I assume is that accurate? That's correct. All right. And that's because he was not, he was sentenced based on information that he was deported three times when in fact he had, he was deported only twice. Is that the essence of the argument? Correct. And what that, what that meant for how the district court ultimately sentenced him, that that was plain error because it affected his substantial rights. And it's the kind of error that this court should reverse, not just that there was an error there, but the significance it had for his compelling mitigation. He did get a downward variance or departure. I always confuse those two on the sentence that was imposed, didn't he? He did not. He got a bottom of the range. Okay. He did. You know, and the mitigating argument is essentially that fatherhood changed him and, and the court is, and how he can support his children has, you know, has morphed. And it means he understands he can never come back and staying out of jail is his priority. He put forth a lot of evidence about being a family man and his children. And the way that the court looked at his criminal record, his children's births had no impact on his, his thoughts about criminality, you know? So it was a significant compelling mitigating argument. So on to the, on to the government's request that this court expand Flores Mejia. Case law is clear that a defense attorney must object after sentencing. Flores Mejia was specifically about raising the issue of meaningful consideration. Council's words here were, Your Honor, I would like to place on the record following the court's recitation of Mr. Brito's appeal rights that Mr. Brito takes the position that insufficient consideration was given to the request for a variance and for the reasons underlying that request. This is exactly what this court requires. And to do more would actually go against Flores Mejia, because one of the reasons that we have this rule is for judicial economy. And what the government, I believe, is proposing is some unending cycle where the court says something, there's an objection, the court clarifies it, the defense counsel makes sure that they got everything right to object. It essentially doesn't end. I think Flores Mejia has a purpose, but it, but what the government's suggesting is required of defense attorneys is too much. Well, correct me if I'm mistaken, but I understood the court to be concerned about repetitive conduct and that accounted for the 70-month sentence. And why wasn't that reasonable? Sorry. So you're, the question is about the substantive reasonableness of the sentence? Right. Okay. So then I'll just finish on the, I can come back to the meaningful consideration because the argument on meaningful consideration was that the district court didn't consider the impact of an illegal re-entry case and an illegal defendant that's a non-citizen and what impact that would have on his imprisonment and the punitiveness of the sentence. And so the court was concerned with the repetitive nature of the offense, but the meaningful consideration argument was about the failure to consider those aspects of defense counsel's presentation. Onto the point about, onto your question about why a 70-month sentence is not reasonable to account for the repetitive nature of the conduct. The point that I raised, the one on substantive reasonableness was that the district court didn't consider the minimal sentence, the minimal sentence sufficient to meet the needs of sentencing, which is, as this court has said, you know, the overriding mandate of sentencing and the overarching instruction. And the court didn't do that. And that is the only, the only ground that I'm raising on substantive unreasonableness. It's, there's really no way to say that 70 months, 50 months, 30 months doesn't meet the court's need for, to address repetitive conduct. There's just, it's just the nature of sentencing that, that any sentence could meet those needs, meet the court's concerns. So I'm raising a specific argument about- But given that, and it's a very good point, and it's almost metaphysics, but yet that vision is in 3553A, the Supreme Court has, as you've said, said it's the overarching mandate of the statute. We have opinions stressing its importance, but how do you make that calculation, whether or not it's 70 months is too much, 65 months would have been fine, 69 months and two weeks, that's okay. We really do get down to not only determining how many angels can dance on the head of a pin, but what song they're dancing to. It's, but yet somehow we're instructing, and I'm a big believer in the parsimony principle, we're instructing the district courts adhere to it. What is there, is there any kind of objective measure, or should there be something on the record where the court is at least wrestled with the, whether or not a lesser sentence would be sufficient to meet the objectives of sentencing, and if so, what is that sentence that the court comes to, and what kind of things play into that? One less day, clearly, there's no difference between 70 months and 68 months and 264 days, and to a person in prison, 24 hours could make a hell of a difference, it's not trivial, the Supreme Court has said that. What is the test, the history of the test? Yeah, that's a, that's a great question, we've been seeing it from- The question with no answer. Yes, I mean, you know, defense counsel suggested three or four years would meet the needs of sentencing, sometimes a variance to just say, I hear that it's punitive and not rehabilitative imprisonment that you're going to face, you know, but that's really just asking that the minimal sentence in these kinds of cases would be a below-guideline sentence, which is something I wouldn't categorically say. It's a, it's a very hard question, how a court can show that it's, that it's considered those things, but sometimes, you know, this court's language about what meaningful consideration is about is enough to give the appellate court assistance in showing that, you know, that it's not devoid of substantive content, there's, there's nothing here, I don't know, I don't know what the magic words would be, but there's nothing here other than at the beginning of sentencing, you know, the rote, I understand it's minimally sufficient, 3553A, there's nothing on that to show consideration. Yeah, well, I had, I had, yeah, I'm sorry, no, no, I was just going to say I had that concern because if I'm not mistaken, he really doesn't have much of a record to speak of. He's got one prior illegal entry, and this was the second, but other than that, I don't see any substantial or any kind of prior offense record, and so it just seemed like six years, but I know it's left to the sentencing judge's discretion, but it just seemed like it was a bit off the charts as far as these types of cases go. So just to clarify the record, he does have a prior drug trafficking. Oh, he does? Yeah, he does, and he... And that accounts for his re-entry, it's two prior re-entries, is that... It does, he was deported after a drug trafficking offense, and he had the unlucky luck to be charged in three different jurisdictions at the same time. He was charged in the Eastern and Southern Districts of New York and the... Well, thanks for correcting that, it's more substantial than that. It is more substantial, you know, and his guideline range, as defense counsel argued, his guideline range is based on those offenses. He had, you know, both on the offense level and on the criminal history, he, it accounts for his prior record, and that is one of the things that distinct from other offenses that he is many times over being punished for his conduct, which he's already served time for. You don't challenge the reasonableness of the sentence, you're challenging the fact that he was sentenced on the assumption that he had been deported three times as opposed to two times. Yes, so the three grounds are the factual error and the error on the deportations, the lack of meaningful consideration of the illegal re-entry client in the scheme of criminal justice sentencing and punishment, and then finally, the lack of consideration of the minimally sufficient sentence. And these are all very grand scale questions about, you know, what a court is actually thinking, what we can guess from the record, what would show the appropriate consideration for this court, but this court does require more than what this record is. There just has to be something more to assist the appellate tribunal, and here we are trying to figure out if the district court did enough. You know, I look at the language about the request for a variance, and I think this could be a sex trafficking case, this could be a securities fraud case, there's nothing about what the court said that actually pinpoints anything about an illegal re-entry defendant and the unique circumstances. She says, I consider going below the guidelines, and I'm not going to in this case, and I looked at other defendants, and I don't see a discrepancy, and I don't see anything there that is meaningful. I see there's language, it's more than in Flores, Mejia, okay, thanks, anything else. It's not that, where it's a few words, but the words don't actually give this court anything to go with. Yes, well, thank you very much, and let's see if there are additional questions we can hear from Mr. Romano. Mr. Romano, I'm sorry. May it please the court, John Romano for the United States. I'll start with the waiver point. You know, whether this is a waiver, or an invited error, or something else, I mean, it's a unique situation. How is it invited error by saying you're not really listening? Well, it's a factual issue, and Judge Cechi, I think, took the time, asked counsel if there was any issue with the facts, and counsel's response was, well, I wasn't listening, but if you got it right, then I'm fine with it. I don't know how, you know, counsel could say that, and then show up in the third circuit, and say, oh, well, the district court got it wrong. That's how she does it. Object, that's a classic forfeiture. It's not knowing, because he said he didn't know, and it's not voluntary, because he's not choosing to assent to whatever he said, but saying, you know, I'm not raising objection here. I didn't hear what you said, whatever, just whatever the pre-sentence report says. Well, Your Honor, I think it's worse than that. I mean, again, it's not the classic, I sat there and didn't say anything. Judge Cechi went out of her way, asked if there was a problem, and counsel said, well, I don't know, I wasn't listening, but if you got it right, then great. I mean, I don't know that you should then be able to show up in the court of appeals. And say you didn't get it right. Excuse me? And say you didn't get it right. You're saying, counsel said, if you got it right as an object, you're saying, okay, won't you say, if you got it right as an object, you shouldn't be able to show up in the court of appeals and say, ah, you didn't get it right. I object. Well, Your Honor, I don't know that we should be asking, you know, counsel should be saying, you know, evidentiary issues. Well, Your Honor, if you didn't abuse your discretion, then I'm good with it. I mean, it seems like an odd thing to them. So this is a record specific point. Let's talk about the reading of James. Do you disagree with Ms. Brill's reading of it? Do you read James as saying generally, no objection amounts to a waiver? I mean, is there any basis for reading it as turning all those from forfeitures into waivers? I think it's probably a little bit more than that. But if you are satisfied with what's happening, which is what happened in James, in other words, there was indication that the defense counsel was sort of okay with this exhibit coming in. And that was enough for a waiver. So you do not, there is no basis for reading James to say no objection equals waiver. There has to be more showing that you knew and assented to it. I think that's what James stands for. And I think, as Ms. Brill, you know, pointed out, I think that the court clarified James to sort of make that point. Again, look, I think that this is a unique situation that we have here. It's not exactly James. It's not exactly waiver. Again, waiver is the knowing, you know, intentional relinquishment of a known legal right. Here, we're talking about a factual issue. But it just seems hard for me to defense counsel to sort of string along the district court and then show up in the Court of Appeals and complain that the district court got it wrong, especially where the court, again, Judge Checki went out of her way to ask, hey, did I get this right? You know, counsel could have said, I'm sorry, I wasn't listening. Can you repeat that? Or can I make sure you got that right? None of that. Just said, yeah, I wasn't listening. If you got it right, then great. Go ahead. Wait a minute. Now, in fact, in point of fact, did the sentencing court get it right or not? Yes, I think the court did get it right. And, you know, let's let's let's switch over to the plain error portion of this. But wait a minute. I thought that the sentencing court had had proceeded on the assumption that the defendant had been deported three times when, in fact, it was it was two times. Well, that's the that's the defendant's reading of what the court said. What the court said was went through the first deportation. Then when it got to the second deportation, said defendant was again deported, then talked about this other offense. Now, I think this is kind of confusing because, as Ms. Brill points out, the defendant had three different convictions essentially at one time in three separate jurisdictions. So Judge Checky then talked about the New Jersey conviction and said, again, the defendant was deported. Didn't say the deported was the defendant was deported yet again. Didn't say the defendant was deported for a third time. Didn't say the defendant was deported again and again and again. In your brief, you admitted that the defendant's reading is at least a plausible reading. Sure. I know. I can't disagree with that. We can't be confident that the judge got it right. This is on plain error review and the defendant. OK, so you're right. There's a there's a duty to show that there's an error and the error is on the record. But, you know, if we think that the defendant's reading is more plausible, then that's enough, isn't it? No, I disagree, Your Honor, because there's two. Let's look at the first two prongs of plain error review. Number one, is there an error? The error here means a clearly erroneous finding effect, which means normally this court needs a definite and firm conviction that a mistake was definite and firm, not sort of maybe plausible, definite and firm conviction. But it sounds like it sounds like your response is maybe not that there was no error. Yeah, maybe. But again, it's the defendant's burden on plain error review. And again, let me go to the second prong of plain error review. And if we look at the last part, I think it's the last paragraph of Justice Scalia's opinion in Puckett, is that's a that's a plain error review case of a plea agreement breach. So a little bit different. But Justice Scalia says, of course, the second prong of plain error review also will often have some bite in plea agreement cases. Not all breaches will be clear or obvious. So again, we're left fighting about, well, did Judge Cechi mean he was deported yet again? Or was she simply emphasizing his second deportation? It's not clear or obvious. It's but you know, given that there's always saying on plain error review and the meaning in the high hurdle of plain error review, doesn't it make sense if we can just put aside all of the legal stuff that we have to look through to get to the kind of really hyper technical analysis that they pay us to engage in? Why not just send it back to the district court? If the district court's interpretation of the record was what you're suggesting, he gets the same sentence. If it was otherwise, he might still get the same sentence. Even if the court got it wrong, the court could look at this and say, yeah, well, I was wrong. But given his prior history, I think 70 months was appropriate. Or the court might say, geez, had I known he was only re-entered twice and not three times, I would have cut this guy a little more slack than I did. Maybe it's six months. Maybe it's a year. Maybe it's two months. Why not let the district court decide that? Incredibly simple solution, non-technical solution. Maybe it's not even a bucket-like solution. But it sure as hell makes a lot of sense. I know common sense goes out the door sometimes when I engage in legal analysis. But I like to try to keep it in the room if I can. Well, I have two responses to that, Your Honor. First, it's the defendant's burden on plain error review. We haven't even gotten to the last, the third, and the fourth problem. The response is a very, very technical, legal, and now analytical response. Well, Your Honor, it's a burden for a reason. He has the burden to show it. And if he hasn't shown it, he shouldn't get the windfall of a re-sentencing. And the second point, Your Honor, How is that a windfall? He could go back and he could get 70 months. He could get 72 months. If he hasn't proven plain error, which he's supposed to, then he shouldn't get a re-sentencing. That's how the burden works. And the second point, Your Honor, I see, Judge Bevis, you might have a question. Let's look at what Flores-Mejia says at note six. That's for the en banc court. Re-sentencing imposes a significant burden on district courts. Not only do they have to find time in their busy dockets to revisit errors that could have been resolved with a contemporaneous objection at the original sentencing, but they also have other burdens. All right, Mr. Romano, two responses. First of all, the Supreme Court is above us, and they handed down Rosales-Morelas after Flores-Mejia. And Rosales-Morelas said, re-sentencing, not such a big deal. So I'm not sure how much weight to put on that footnote. But my question is actually about, I might agree with your reading of the law, except I don't agree with your reading of this record, because what happened is she mentioned removal or deportation three times, and you have to strain to consolidate that down to two and say it was a repetition. So let's assume we've gotten past prongs one and two. Let's assume I disagree with your reading of the record, okay? Let's focus on prong three. Now, we got this problem because you want to say it didn't affect substantial rights, but it's true it was the bottom of the range, but we're under advisory guidelines. The judge was free to go below the range. There's no minimum constraining them. And Rosales-Morelas seems to say, hey, you could have given a lower sentence, and we need to, we ought to do this over again. So do you have a way around Rosales-Morelas at prongs three and four here? Sure, Your Honor. Rosales-Morelas was a guidelines error. So the district court started from the wrong place. Here, as the court was very clear in Ferguson, you need to show that the district court actually relied on this error. You need to bridge the gap between reference and reliance. What is it in this record that shows that Judge Cechi was so overwhelmed by three deportations that she wouldn't have given the same sentence if he had two deportations? It's Ms. Brill's argument that his defense was, I turned my life around after I had kids. I changed my behavior. In this chronology, if it's in fact three, as your adversary says, as I think is the most natural reading of the transcript, then it contradicts his argument for leniency that he actually changed his life around. Why are you shaking your head? That's not true, Your Honor. That's simply not true. That would mean that Judge Cechi got not just this wrong, but got a whole host of things wrong. I think that Judge Cechi, quite frankly, is a conscientious judge. We should give her the benefit of the doubt that she could read the PSR. Judge Cechi said in 2011, he was sentenced and deported. That is true. That is when he was sentenced, in 2011. So there's nothing about what she said that contradicts any part of his timeline. She didn't say he committed that offense in 2011. She didn't say he committed that offense after having a child. Didn't say any of that. What she said was actually true. Sentenced in 2011 and deported. Also, she never said anything about, you know, doing this offense after having a child. The only place where that comes up, quite frankly, is in the defendant's sentencing brief. At Special Appendix, page three, you could read that and very clearly see he did continue selling drugs after the birth of his daughter. So I think that this whole thing basically involves assuming that Judge Cechi committed a host of errors, none of which, of course, the defendant objected to. It seems strange that Judge Cechi made all these errors while giving her sentence and the defendant never stood up and said, hey, did you think I was deported three times? Because I was actually only deported twice. Or, hey, did you think I committed this offense after I had my child? Because I didn't. And there's a reason that didn't happen. Because Judge Cechi never said it. But going back to prompt three, is there anything in this record that says or would make us believe that, hey, if Judge Cechi knew that it was only two deportations, she would have given an even lower sentence? Now, mind you, she gave the bottom of the guidelines range sentence. And I didn't point this out as well as I should have in my brief. That sentence was only 10 months longer than the sentence he got the first time he committed aggravated illegal reentry. So is there really a reasonable probability that if Judge Cechi would have given a lower sentence than she already gave simply because he was deported twice instead of three times? I don't think that that's reasonable at all. And if we go to the fourth prong, which we haven't talked about yet, and again, Judge, I relied heavily on the green screen, we need to look at the seriousness of the error in the context of the entire case. Well, what is the error? Two deportations instead of or three deportations instead of two deportations, where we can't find any actual reference to that in the court's explanation for its sentence. Judge Cechi could have said, gee, you were deported again and again and again. Or she could have said, you were deported not once, not twice, but three times. None of that. So we're sort of inferring that it must have made a big difference to her when there's no reason to believe that. And the point I also made in the is he probably got an enormous windfall already. He should have received an extra four-point or four-level offense-level enhancement. So if anything, he's already gotten a huge break in his guideline range and has already gotten a huge break in his sentence. Looking at the whole case, would we really say that not correcting this would work an injustice, which is what prong four requires? If the court has no questions about that, then I would like to address the procedural unreasonableness argument about the preservation of the issue on appeal. Before you go on, my Zoom has frozen. I've heard everything that you've said so far. I'm just going to disconnect and then reconnect and hope that it unfreezes. So I'll be back in like two minutes. Okay. Apologies for the interruption. It appears we have a connection issue. Okay. Judge McKee is coming in again now. Hi, Judge. It looks like the audio is still connecting right now. Judge, can you hear me? Okay. So Judge McKee, I still can't hear you. Okay. Hello, Greg. Oops. Hello. Yes, I'm here, Judge. Oh, okay. Good, good, good. Yeah, we're just trying to resolve Judge McKee's audio. Oh, yeah, no problem. I didn't know where that hung up, but I'll hold on. Thanks. Okay. Okay, we're going to have Judge McKee disconnect and reconnect, so just bear with us. Okay. Thanks for your patience. Okay. Okay. Now, can you hear that? Yes, we can hear you, Judge. Okay. We wouldn't get it. I'm sorry. I don't know what that problem was, but... I had an issue on my end, too, so I'm not sure exactly what occurred, but yes, we do hear you. It's just that your video is cut off. Oh, it sure is. Okay, that I can fix easily. There, okay. Mr. Romano, do not take that as any kind of an editorial assessment of your argument. It's really cybernetic technical stuff. Okay. No problem, Your Honor. Okay, now I apologize for that. Go ahead. I think where we left off, I was just addressing the preservation of the procedural unreasonable argument, and this court has not exactly made clear what needs to be done to preserve such an argument, what detail is necessary, but it should find that there was not enough here. The entire sentencing proceeding was about variances. The defendant made about five or six different arguments for downward variances, and then to preserve the argument, she simply said, well, you didn't really address the arguments for variance. We didn't explain them, and that's not giving Judge Cechi a whole lot to work with. That's pretty much you didn't do anything. You didn't address anything, and I think some courts have held, and I think rightly so, that you should give a little bit more detail so that the court can actually address your complaints at that time. That would give the court the opportunity, and then we wouldn't have to deal with this on appeal as to whether, I mean, the court did or didn't. So if here, for example, if the defendant had said, Your Honor, we made an argument that as a deportable alien, he deserves a shorter sentence, we don't think you really addressed that, then Judge Cechi would have said, great, yes, I addressed it enough, or here, here's some more explanation, and that's the whole point of the Flores-Mejia rule, is to give district courts the opportunity to correct any of those mistakes. And I would just ask that if this court finds that the defendant did enough here, then it should make clear that that also applies to the government as well, because there's, quite frankly, been plenty of sentencings I've read where I've said, You know what? I don't think that's sufficient to preserve that objection. Let's not go ahead and appeal. But if it applies to the defendant, it applies to the government as well. So I think the court should make that clear. I guess my final point is the defendant raised a substantive unreasonableness point. The test is, you know, no reasonable court would have given the same sentence. This is a bottom-of-the-ring sentence. This court has cases that says the district court is under no obligation to explain why a shorter sentence would have been enough. That's, I think, Charles and Dragon. The court's under no obligation to lay out the parsimony principle. That's the Calabretta opinion. So what we're left with here is, you know, would any reasonable sentencing court have given a bottom-of-the-guidelines-ring sentence, which, by the way, was probably years too low, to this defendant who had, you know, a previous aggravated illegal reentry and no less than, I mean, two or three, depending on how you count them, serious federal drug trafficking conspiracies and offenses, one of which involved, I think, 15 kilos of heroin and a separate New Jersey drug trafficking conviction. So I think the answer to that is no. So if there's no questions, I would ask that this court affirm. Thank you, Mr. Romano. Ms. Brill, you deserved, I think, some time for rebuttal. Let me ask this. Is it possible you could win the battle and really get clobbered in the war? What if we were to send it back and the judge was to look at this and say, oh, my goodness, I didn't think there were only two. I thought there were three. But this other conviction that he has for dealing heroin, as Mr. Romano said, was 15 kilos. I thought that was 1.5 kilos. You see, now it's 15 kilos. 70 months does not begin to do justice to the kind of sentence I think has been imposed. I'm going to wrap it up a little bit. What would prevent the court from doing that? So long as the court makes clear it's not being done to retaliate for the appeal, which obviously cannot be done. What if the judge says, yeah, I don't know what happened to me this day, but this guy deserves a lot more than 70 months. Could that happen? Nothing would prevent the court from giving an upward variance. What would prevent the court from giving an upward variance would probably be Mr. Brito's conduct post-sentencing in prison. There'll be a lot, if we go back for resentencing, for him to come back with. And so I would say principles of fairness would prevent the government from making the argument. But the court could certainly sentence as she saw fit. Speaking of the government making the argument about a higher guideline range, though, this court should not consider that for pronged court. This is actually an example of when a party has waived the argument. The government had multiple opportunities to object to the guideline range. At appendix page 35, the government said no objection corrections to the criminal history category four total offense level at special appendix 12. They said that the PSR was correctly calculated. The PSR flagged a potential issue. The government didn't respond. This is the same office. It's bound by its decisions. There's no second bite at the apple, and it's certainly not appropriate for this court to consider that on prong four of the plain error. And the government talks about the context of the entire case, and they cite to a case Greenspan. I'm just going to read from Greenspan. This is 923 Fed Third 138. Here the context is that Greenspan strategically skipped allocution while expressing remorse on video and in writing to get a much lower sentence. That is precisely the type of sandbagging strategy that makes appellate courts particularly reluctant to notice an error as plain error. Courts must not create incentives for defendants to ignore errors at trial, to keep an issue for appeal as insurance in the event they are convicted. This would be rewarding counsel strategy for not raising these issues. It's certainly not appropriate on appeal now for the government to say that the guideline was miscalculated. I think this would be, to respond to Judge Bibas, a clear example of waiver where we have multiple examples of the government saying no objection, corroborating that, in fact, they have no objection. And I would ask this court to not base a prong four finding on the government's argument here. Just finally, Judge McKee, I just want to thank you for appreciating that one month, six months, 12 months, that this has significant impact for a criminal defendant, that we're talking about 70 months or 60 months or what would be appropriate, but any day less in prison would have a significant impact on his life. And so to remand for resentencing with the risk that the judge could give an upward variance, clients would take that risk. Clients would feel comfortable going before a judge and presenting their case and then hoping for a sentence that respects that every day of imprisonment is a burden to them. Any other questions, Judge Bibas, Judge Fuentes? No, I have no questions. Nothing. Okay. Thank you. Thank you both. It's a very helpful argument. It's very well done and we appreciate it, Mr. Romano and Ms. Brill. Thank you very much for taking that in your advisement. Could I request a transcript? Oh, please. Good idea. Could you speak with Mr. Kane? I want to take just a quick break to deal with the case anyhow. And in that interim, he can then remember how you get the transcript and will ask the government in all of its wealth to pay for the transcript, which will be relatively modest. But I'm sure that the government's probably in a better position to pay for it than Mr. Brito.